Calvin **HAWKINS** and Donna L. **Hawkins**, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 04–1687C.

United States Court of Federal Claims.

Aug. 31, 2005.

Paul Gordon Taggart, King & Taggart, Ltd., Carson City, Nevada, for Plaintiffs.

Hillary Adrienne Stern, United States Department of Justice, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

BRADEN, Judge.

Congress could not have been more explicit as to the purpose of the Public Safety Officers' Benefits Act ("PSOBA"), 42 U.S.C. §§ 3796, *et seq.*, nor Congress' intent and expectations regarding implementation:

> The motivation for this legislation is obvious: The physical risks to public safety officers are great; the financial and fringe benefits are not usually generous; and the officers are generally young with growing families and heavy financial commitments. The economic and emotional burden placed on the survivors of a deceased public safety officer is often very heavy. The dedicated public safety officer is concerned

> about the security of ... family, and to provide the assurance of a Federal death benefit to ... survivors is a very minor recognition of the value our government places on the work of this dedicated group of public servants.

S.Rep. No. 94–816, at 3–4, *reprinted in* 1976 U.S.C.C.A.N. 2504, 2505.

In this case, the court has determined that Ms. Nancy M. Hawkins was a "public safety officer," who died as a direct and proximate result of a personal injury sustained in the "line of duty." *See* 42 U.S.C. § 3796(a).

## RELEVANT FACTS [1]

In 1984, Ms. Nancy Hawkins was a sworn member of the Washoe County [Nevada] Sheriff's Department Posse, a group of reserve Deputy Sheriffs. *See* AR Ex. 6. On December 8, 1984, in response to complaints from private landowners that wild and/or errant horses were trespassing on their property, the Sheriff organized a Task Force that included: full-time Deputy Sheriffs in patrol cars; a helicopter equipped with a police siren; and members of the Washoe County Volunteer Mounted Posse. *See* Compl. Ex. C; *see also* Compl. Ex. A–B. Ms. Hawkins was a member of the Washoe County Volunteer Mounted Posse that participated in the Task Force to round up the horses. *See* AR Ex. 6.

During the Task Force operation, the helicopter activated a siren in an attempt to direct the horses toward a canyon surrounded by the mounted members of the Sheriff's Posse. *See* AR Ex. 2. The noise caused the horse Ms. Hawkins was riding to bolt. *Id.* Ms. Hawkins suffered severe injuries as a result of being thrown off the horse. *Id.* On December 10, 1984, Ms. Hawkins died as a result of these injuries. *Id.* Ms. Nancy Hawkins was survived by her husband, Calvin L. Hawkins and her children, Charles L. Hawkins, Edward B. Hawkins, Mark A. Hawkins, Steven M. Hawkins, Tawnya M. Hawkins,

---

1. The relevant facts recited herein were derived from: the November 19, 2004 Complaint ("Compl."); the Administrative Record ("AR"), submitted in part on March 16, 2005 and March 29, 2005; and Plaintiff's April 29, 2005 Supplement to the Administrative Record ("SAR").

and Donna L. Hawkins.[2] *See* AR Ex. 4; AR 13.

On December 11, 1984, the Washoe County Board of Commissioners issued a Resolution stating "Nancy Hawkins made the supreme sacrifice as a result of a mishap during her participation in the field with the Sheriff's Mounted Posse in an effort to protect and preserve the rights and property of others[.]" SAR at 10. The Sheriff awarded Ms. Hawkins the Silver Cross, an award given only to a member of the Sheriff's Office when "killed in the performance of duty under honorable circumstances." *See* SAR at 12–13.

## PROCEDURAL HISTORY

### A. Initial Determination Of The Bureau of Justice Assistance.

On June 20, 2001, Plaintiffs filed a claim with the Bureau of Justice Assistance ("BJA") for survivor benefits, under the PSOBA. *See* AR Ex. 1. On June 2, 2002, the BJA determined that, as a member of the Washoe County Volunteer Mounted Posse, Ms. Hawkins had no law enforcement authority and, therefore, she was not a "public safety officer," as defined by the PSOBA. *See* AR Ex. 4. Plaintiff requested reconsideration. *See* AR Ex. 13. On February 26, 2003, an Administrative Hearing was convened. *See* 28 C.F.R. § 32.24(a).

### B. Decision Of A Bureau Of Justice Assistance Hearing Officer.

On October 7, 2003, the BJA Hearing Officer issued a Decision of Redetermination again denying Plaintiffs' claim:

PSOB Regulation 28 C.F.R. 32.2(j) defines a public safety officer as follows: "... any individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer, firefighter, rescue squad member or ambulance crew member." PSOB Regulation 28 C.F.R. 32.2(m) goes on to define a law enforcement officer as follows: "... any

individual involved in crime and juvenile delinquency control or reduction, or enforcement of the criminal law, including but not limited to police, corrections, probation, parole, and judicial officers.["]

\* \* \* \* \* \*

Claimant's brief thus establishes a threshold case for finding that Ms. Hawkins was a public safety officer with law enforcement authority, as defined in PSOB Regulations. However on closer examination other facts in the record undermine this argument. The information in the case file provided by the claimant is insufficient to establish that members of the Washoe County Sheriff's Posse were vested with the requisite law enforcement authority to qualify them as law enforcement officers within the meaning of the PSOB Regulations. There is no job description formally setting out the duties of posse members, no County ordinance or policy related to the establishment of a Posse, and no State law specific to Posses. While Ms. Hawkins may have been sworn in pursuant to the authority vested in the Sheriff by NRS 248.040 to appoint deputies, that alone does not establish what authority the Sheriff, in fact, delegated to or vested in Posse members and whether that authority included carrying out any duties related to [crime control].

\* \* \* \* \* \*

While it may be that preserving and protecting private property from wild horses falls within the broad law enforcement duties of the sheriff under Nevada law, the Sheriff's letter does not distinguish such general law enforcement duties from those which specifically involve [ ] "crime and delinquency control and reduction, or enforcement of the criminal law."

To the contrary, the case file indicates that a reserve or special deputy sheriff serving as a posse member is neither authorized to carry firearms nor to exercise arrest pow-

---

**2.** Donna L. Hawkins was the only "child" of Ms. Nancy Hawkins eligible to claim PSOBA benefits. *See* 42 U.S.C. § 3796b(3)(i)-(iii) (requiring a surviving "child," at the time of the public safety officer's death, to be: 18 years of age or under; over 18 years of age and a full-time student, as defined by Section 8101 of Title 5; or over 18 years of age and incapable of self support because of physical or mental disabilities).

er[.] They receive no formal law enforcement or peace officer training.

\* \* \* \* \* \*

The case file contains a variety of references to past posse activities, including search and rescue, round up of horses (to protect property rights), participation in community fund raisers, crowd control at public events . . ., traffic control, and parades. And yet these duties would not constitute duties in the nature of "crime and juvenile delinquency control and reduction, or enforcement of the criminal law[.]"

Even if the claimant had been able to demonstrate that posse members have job duties related to [crime control] or enforcement of the criminal law[ ] such as riot control . . ., it is apparent that any such duty or duties are not the primary function of a Washoe County posse member. For such ". . . officers, 'line of duty' means any action the officer is so obligated or authorized to perform in the course of controlling or reducing crime, (or) enforcing the criminal law[.]"

\* \* \* \* \* \*

Thus the claimant contends that because the horses being rounded up by the posse on December 8, 1984 were "criminally trespassing on private property, their removal was a crime fighting activity[.]" Claimant submitted a copy of NRS 569, Estrays and Livestock, and NRS 206.140, which makes it a misdemeanor offense for any 'person who' . . . 2. Commits any trespass upon the grounds attached (to any building, public or private) . . . or any fixtures placed thereon, or any enclosure or sidewalk about the building [.]"

NRS 569 does provide for rights and responsibilities of persons with regard to estrays and livestock. "Estrays" are "livestock running at large upon public or private lands in the State of Nevada, whose owner is unknown[.]" "Livestock" is defined to include horses, among other animals.

However, the rights and responsibilities established by NRS 569 make the owner of estrays *civilly,* not criminally, liable for the cost of their care in certain situations and for damages caused by the trespass of livestock onto grounds enclosed by a "legal Fence." This responds to the prospect that these estrays were not wild (as referenced in many of the statements contained in the case file) but, in fact, were owned by a person referred to in several of the case documents as pointed out in the September 10, 2003 letter from claimant's counsel.

Furthermore, NRS 569 does not suggest that livestock can commit a criminal trespass. The misdemeanor trespass statute, NRS 206.140 applies only to a "person" who commits a trespass described by the statute. Horses are referred to as "livestock" in NRS 569, not as persons. There is no Federal or State law, known to this Hearing Officer, which extends the definition of "person" to animals. And it is significant that under NRS 207.200, criminal trespass requires that the unlawful entry be accompanied with an "intent to harm," whereas horses do not have the mental capacity to form criminal intent.

Therefore, while a horse may commit a trespass in that its entry on private land is an unlawful interference with property rights, such trespass is in the nature of a civil wrong. Consequently, the claimant has failed to establish that the action of the posse, in rounding up the horses on December 8, 1984, constituted ". . . controlling or reducing crime (or) enforcing the criminal law" as required by 28 C.F.R. 32.(c)(1) [sic].

As for the relevance of the Nevada state workman's compensation decision to this claim pursuant to 28 C.F.R. 32.5, the Court of Claims has spoken to this matte in *North v. United States,* [555 F.Supp. 382,] 1 Cl.Ct. 93 at 98 [1982]: "Although differing Worker's Compensation statutes in a multiplicity of states would under their quite different standards often reach a contrary result, they do not correspond to the specific standards mandated by the Public safety Officer's (sic) Benefits Act of 1976." And as explained above, claimant has not met the specific standards of the PSOB Regulations in this case.

Finally, in *Tafoya v. United States,* 8 Cl. Ct. 256 at 259 FN 3, the Court had the

following to say about the a claimant's burden of proof:

"Section 32.21(b) of the regulations states: 'Whenever a claimant for any benefit or fee under the Act and the Regulations has submitted no evidence or insufficient evidence of any material issue or fact, the Administration shall inform the claimant what evidence is necessary for a determination as to such issue or fact and shall request him to submit such evidence within a reasonable specified time. The claimant's failure to submit evidence on a material issue or fact, as requested by the Administration, shall be a basis of determining that the claimant fails to satisfy the conditions required to award a benefit or fee or any part thereof.'

This regulation clearly indicates that the burden is on the claimant to produce sufficient evidence on each material issue in order to satisfy his or her burden."

For the reasons set out above, I have concluded that the Claimant in this case has not met his burden of proof in that he has provided insufficient evidence to establish that Volunteer Posse Member Nancy Hawkins was a law enforcement officer within the meaning of the PSOB Regulations; and, in any event, insufficient evidence was also provided to establish that at the time of her death, Ms. Hawkins was acting in the line of duty pursuant to the requirements of 28 C.F.R. 32.2(c)(1).

AR Ex. 9.

## C. The Director Of The Bureau Of Justice Assistance Has Not Issued A Final Decision.

On February 10, 2004, Plaintiffs filed an appeal of the Hearing Officer's Decision, pursuant to 28 C.F.R. § 32.24(h). *See* AR Ex. 13. On March 5, 2004, Plaintiffs filed a Supplemental Brief and Exhibits in support thereof. *Id.* The Final Decision of the BJA Director was due April 10, 2004. *See* 28 C.F.R. § 32.24(i)(2). On April 19, 2004, Plaintiffs inquired as to the status of the appeal; no response was received. *See* AR Ex. 13. To date, the BJA Director has not issued a Final Decision. *Id.*

## D. In The United States Court Of Federal Claims.

On November 19, 2004, Plaintiffs filed a Complaint in the United States Court of Federal Claims seeking survivor benefits under the PSOBA and attorneys fees. *See* Compl. ¶¶ 52–61.

On March 16, 2005, the Government filed a Motion for Judgment on the Administrative Record, Statement of Facts, and Volumes I and II of the Administrative Record. On March 29, 2005, the Government filed Volume III of the Administrative Record.

On April 29, 2005, Plaintiffs filed an Opposition to the Government's Motion for Judgment on the Administrative Record, a Counter Statement of Facts, and a Supplement to the Administrative Record. In Plaintiffs' Opposition, the court was requested to "overturn" the BJA's decision and "grant the PSOB death benefit according to law." Pl. Opp. at 15.

On May 25, 2005, the Government filed a Reply and Counter Statement of Facts. On June 29, 2005, Plaintiffs filed a Surreply.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (quoting *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). Therefore, in order to come within the jurisdictional reach of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive

right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed.Cir.2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth v. United States*, 378 F.3d 1371, 1384 (Fed.Cir.2004) ("Because the Tucker Act itself does not provide a substantive cause of action, ... a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

In this case, the United States Court of Federal Claims has jurisdiction over Plaintiffs' claims because the Complaint properly invoked both the Tucker Act, *i.e.*, the "specific statute [that] sets the court's jurisdictional parameters" and the PSOBA, *i.e.*, "a separate statute [that] establishes the right that allegedly has been breached." *Fisher v. United States*, 364 F.3d 1372, 1376 (Fed.Cir. 2004).

### 1. Statute Of Limitations Considerations.

■ A claim for survivor benefits under the PSOBA must be filed within one year after the date of death of the public safety officer, unless the time for filing is extended by the Director for good cause shown. *See* 28 C.F.R. § 32.20(c). In this case, Plaintiffs did not file a claim for survivor benefits until June 20, 2001, more than 17 years after the December 10, 1984 death of Ms. Hawkins. *See* AR Ex. 1. The BJA, however, accepted the claim and subsequently issued two decisions, neither of which challenged Plaintiffs' claim as time-barred. *See* AR Ex. 4; AR Ex. 9. Therefore, the court has determined that the BJA Director exercised discretion under 28 C.F.R. § 32.20(c) to allow the filing of Plaintiffs' claim for good cause.

■ The statute of limitations for initiating a claim in the United States Court of Federal Claims is six years after the claim first accrues. *See* 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). A claim under the Tucker Act first accrues "as soon as all events have occurred

that are necessary to enable the plaintiff to bring suit, *i.e.*, when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for ... money." *Chambers v. United States*, 417 F.3d 1218, 1223 (Fed.Cir.2005) (citation omitted).

Since all events to fix the Government's alleged liability and entitle Plaintiffs to sue did not accrue until October 7, 2003, the date the Hearing Officer's Decision was issued, the court has determined that the November 19, 2004 Complaint was filed well within the six-year statute of limitations and the United States Court of Federal Claims has jurisdiction to adjudicate the survivor benefits claim at issue in this case. *See* 28 C.F.R. § 32.24(g) ("The hearing officer's determination shall be the final agency decision, except when it is reviewed by the Director[.]").

### 2. Ripeness Considerations.

On February 10, 2004, Plaintiffs filed an appeal of the BJA Hearing Officer's decision to the BJA Director. *See* 28 C.F.R. § 32.24(h). To date, the BJA Director has not issued a decision. The Government has decided to deem the BJA Hearing Officer's Decision as a final decision. *See* Gov't Mot. J. AR at 7 (citing 28 C.F.R. § 32.24(g)). Accordingly, the Government has represented that it "does not intend to argue that [P]laintiffs have failed to exhaust administrative remedies in this case." Gov't Motion J. AR at 7 n. 2. Accordingly, this matter is now ripe for judicial review.

### 3. Standing Considerations.

The PSOBA provides that "the Bureau shall pay a benefit ... [I]f there is a surviving child ... and a surviving spouse, one-half to the surviving child ... of such officer ... and one-half to the surviving spouse." 42 U.S.C. § 3796(a)(2). At the time of Ms. Hawkins' death, Calvin Hawkins was a surviving spouse. Donna L. Hawkins was the only "child" 18 years of age or under. *See* 42 U.S.C. § 3796b(3)(i). Therefore, Plaintiffs, as the spouse and "child" of Ms. Hawkins, have standing to bring this action in the

United States Court of Federal Claims. *See* AR Ex. 1.

## B. Standard For Decision.

### 1. On A Motion For Judgment On The Administrative Record.

The standard for a decision on a Motion for Judgment on the Administrative Record, pursuant to RCFC 56.1, is similar but not identical to a motion under RCFC 56 for summary judgment. *See Bannum, Inc. v. United States,* 404 F.3d 1346, 1355 (Fed.Cir. 2005). The court's inquiry on a motion for summary judgment is whether the moving party has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In contrast, the standard for a decision on a Motion for Judgment on the Administrative Record is narrower, *i.e.,* given all the disputed and undisputed facts, whether the plaintiff has met the burden of proof to show that the decision was not in accordance with the law. *See Bannum,* 404 F.3d at 1357 (instructing the court to make "factual findings under RCFC 56.1 from the [limited] record evidence as if it were conducting a trial on the record.").

### 2. On A Final Decision From The Bureau Of Justice Assistance.

■ The United States Court of Appeals for the Federal Circuit has held that judicial review of a BJA denial of death benefits under the PSOBA is "limited to three inquiries: '(1) whether there has been substantial compliance with statutory ... and implementing regulations; (2) whether there has been any arbitrary or capricious action on the part of the Government officials involved; and (3) whether there was substantial evidence supporting the decision.'" *Chacon v. United States,* 48 F.3d 508, 511–12 (Fed.Cir. 1995) (quoting *Morrow v. United States,* 227 Ct.Cl. 290, 647 F.2d 1099, 1102 (1981), *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981)).

**3.** As of December 10, 1984, the date of Ms. Hawkins' death, the total PSOBA survivor benefit was $50,000.00. *See* Pub.L. No. 94–430 § 701

## C. The Public Safety Officers' Benefits Act, 42 U.S.C. §§ 3796, *et seq.*

The PSOBA provides a one-time cash payment to survivors of public safety officers who die in the line of duty: "in any case in which the Bureau of Justice Assistance ... determines ... that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit[.]" 42 U.S.C. § 3796(a).[3] For a survivor or survivors to qualify for the payment: 1) a public safety officer; 2) must have suffered a "personal injury" within the meaning of the PSOBA; 3) the injury must have been suffered "in the line of duty;" and 4) the death must have been "the direct and proximate result" of the personal injury. *See* 42 U.S.C. § 3796(a).

In this case, the Government has contested whether Ms. Hawkins was a "public safety officer" and incurred a fatal injury in the "line of duty." See Gov't Mot. J. AR at 7–8.

## D. The Court's Resolution Of The Government's Motion For Judgment On The Administrative Record.

### 1. The Bureau Of Justice Assistance's Final Decision Did Not Comply With Congress' Statutory Definition Of "Public Safety Officer."

Congress defined a "public safety officer," in relevant part, as "an individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer, ... [or] rescue squad member[.]" 42 U.S.C. § 3796b(8)(A). Since Congress has defined the term at issue, the BJA must give effect to Congress' express, unambiguous intent. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency[.]"); *see also Chacon,* 48 F.3d at 512 (quoting same).

(1976) (codified as amended at 42 U.S.C. § 3796(a) (1984)).

In order to qualify as a "public safety officer," under the PSOBA in this case, Plaintiffs must establish that Ms. Hawkins was serving: 1) in a public agency; 2) in an official capacity; and 3) as a law enforcement officer.

### a. The Sheriff's Department Was A "Public Agency."

The parties do not dispute that the Washoe County [Nevada] Sheriff's Department was a "public agency," as that term is used in 42 U.S.C. § 3796b(8)(A). *See* AR Ex. 9.

### b. Ms. Hawkins Served In The Sheriff's Department In An "Official Capacity."

 Ms. Hawkins was sworn in as a Deputy Sheriff by the Sheriff. *See* AR Ex. 6 (May 29, 2003 notarized letter from Vincent G. Swinney, Retired Sheriff of Washoe County, Nevada). Thereafter, as a matter of Nevada law, Ms. Hawkins served as a Deputy Sheriff in an "official capacity." *See* NEV. REV. STAT. § 248.040. Under Nevada law, the duties of Deputy Sheriffs include: "all the duties devolving on the sheriff of the county." *Id.* Such duties include: "[to] keep and preserve the peace in their respective counties, and quiet and suppress affrays, riots and insurrections, for which purpose, and for the service of process in civil or criminal cases, and in apprehending or securing any person for felony, or breach of the peace, they may call upon the power of their county to aid in such arrest or in preserving the peace." *See* NEV. REV. STAT. § 248.090. The Sheriff and Deputy Sheriff also are "responsible for searches and rescues with [the] county." *See* NEV. REV. STAT. § 248.092. Therefore, contrary to the Government's assertions, Ms. Hawkins had "arrest authority, authority to carry a firearm, [and] ... crime fighting duties and functions." *See* Gov't Mot. J. AR at 17. Although Ms. Hawkins did not perform criminal law enforcement duties in her three year tenure, she had such authority under Nevada law.

Therefore, the court has determined, as a matter of fact and law, that Ms. Hawkins served in the Sheriff's Office in an "official capacity," as that term is used in 42 U.S.C. § 3796b(8)(A).

### c. Ms. Hawkins Was A "Law Enforcement Officer."

 The Government argues that Ms. Hawkins was not a "law enforcement officer" since her status as a member of the Washoe County Volunteer Mounted Posse had not involved crime reduction or enforcement of criminal laws. *See* Gov't Motion J. AR at 12. In support, the Government cites opinions of the BJA Office of General Counsel upholding law enforcement status of an auxiliary police chief who was responsible for controlling crowds of juveniles, assisting in a drug raid, and making a grand larceny arrest; a state conservation officer who made two arrests two days prior to his death and was authorized to act as a peace officer with respect to state fish and game laws; and a volunteer sheriff's deputy who was charged with "keep[ing] and preserving the peace" and to "quiet and suppress all affrays, riots, and unlawful assemblies;" constables with arrest power; security officers in a psychiatric hospital for the criminally insane; and an animal control officer with peace-officer power and responsibility. *See* Gov't Motion J. AR at 14–15; *see also* AR Ex. 6. Ms. Hawkins apparently had no authorization to carry a firearm, no state certification, nor formal training as a law enforcement officer. *See* Gov't Motion J. AR at 15 (citing AR Ex. 6). As discussed above, Ms. Hawkins had arrest authority under Nevada law, although it appears that the Sheriff and Deputy Sheriffs could call on other assistance, if needed. *See* NEV. REV. STAT. § 248.090.[4]

During her three year tenure as a Deputy Sheriff and member of the Washoe County Volunteer Mounted Posse, Ms. Hawkins' experience was limited to social and ceremonial activities, search and rescue, protection and preservation of property, participation in fund raisers, mounted crowd control, and

---

4. The Government's and Plaintiffs' spirited discussion about whether or not the owners of the horses are liable for criminal trespass under Ne-

vada Law is completely irrelevant to the status of Ms. Hawkins as a "law enforcement officer." *See, e.g.,* Pl. Reply at 13–15; Def. Resp. at 4–6.

traffic direction and control. *See* AR Ex. 9. The Government contends these activities were "incidental functions" of law enforcement officers who carry out police powers, but fall outside the scope of a "law enforcement officer." Gov't Motion J. AR at 16. The Government, however, overlooks the fact that Congress broadly defined a "law enforcement officer" as an "individual involved in ... enforcement of the laws[.]" 42 U.S.C. § 3796b(6). Congress did not define a "law enforcement officer" to exclude those who enforce civil laws. *See* 42 U.S.C. § 3796b(6) ("An individual involved in crime ... control or reduction *or* enforcement of *the* laws, including, but not limited to, police[.]") (emphasis added). Police are the "governmental department charged with the preservation of public order [and] the promotion of public safety[.]" BLACK'S LAW DICTIONARY 1196 (8th ed.2004); *see also id.* at "Police Power" (quoting ERNST FREUND, THE POLICE POWER § 3 at 3 (1904)) ("[I]t is possible to evidence at least two main attributes or characteristics which differentiate public power: it aims directly to secure and promote the public welfare, and it does so by restraint or compulsion."). Moving stray horses off of private property clearly is a proper exercise of police power, in that such action preserves the public order and promotes public safety.

Therefore, the court has determined, as a matter of fact and law, that Ms. Hawkins was a "law enforcement officer," as the term is defined in 42 U.S.C. § 3796b(6).

### 2. The Bureau Of Justice Assistance's Final Decision That Ms. Hawkins Did Not Die "In The Line Of Duty" Was Contrary to Law, As Well As Arbitrary And Capricious.

In *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–17, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the United States Supreme Court set forth a precise and detailed analysis of the appropriate "standards" of review to be applied by a court reviewing agency determinations. First, the court must ascertain whether the agency "acted within the scope of [its] authority." *Id.* at 415, 91 S.Ct. 814; *see also* 5 U.S.C. § 706(2)(C). Second, the court must determine that "the actual choice made [by the agency] was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814 (quoting 5 U.S.C. § 706(2)(A)). Under the latter standard, the court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a *clear error of judgment.*" *Id.* (emphasis added); *see also Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (holding an agency's actions could be "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

The Government argues that even if Ms. Hawkins was a "law enforcement officer" for purposes of the PSOBA, she did not die in the "line of duty." *See* Gov't Motion for J. AR at 20.

■ Congress did not define "line of duty" in the PSOBA. The BJA, however, has issued a regulation defining "line of duty" as:

Any action which an officer whose primary function is crime control or reduction, enforcement of the criminal law, or suppression of fires is obligated or authorized by rule, regulations, condition of employment or service, or law to perform, including those social, ceremonial, or athletic functions to which the officer is assigned, or for which the officer is compensated, by the public agency he serves. *For other officers, "line of duty" means any action the officer is so obligated or authorized to perform in the course of controlling or reducing crime, enforcing the criminal law, or suppressing fires[.]*

28 C.F.R. § 32.2(c)(1) (emphasis added). The legislative history of the PSOBA is replete with objections by the Department of Justice that lobbied to limit the scope of "line of duty:"

[W]e believe that accidental death is a hazard of many types of employment and we are aware of no rationale that would suggest Federal intervention in these situations. Providing survivor benefits for those who are killed accidentally should be the responsibility of the employer in the same manner as other employment benefits.

S.Rep. No. 94–816, at 4, *reprinted in* 1976 U.S.C.C.A.N. 2504, 2506.

The Department of Justice lost that battle. Congress declined to limit the scope of the PSOBA to exclude accidental deaths, such as the one that occurred in this case. Instead, Congress required only that a "public safety officer," *i.e.*, a "law enforcement officer ... involved in enforcement of the laws," incur fatal injuries "sustained in the line of duty." 42 U.S.C. § 3796(a); *see also* 42 U.S.C. § 3796b(6) (defining "law enforcement officer"); 42 U.S.C. § 3796b(8) (defining "public safety officer"); *Tafoya v. United States*, 8 Cl.Ct. 256, 262 (1985) (citing *Harold v. United States*, 225 Ct.Cl. 168, 177–78, 634 F.2d 547 (1980)) ("The proper focus in determining whether an officer was acting in the line of duty is on the nature of the acts being performed by the officer at the time of death.").

Congress authorized the BJA to establish "rules, regulations, and procedures as may be necessary to carry out the purposes of the [PSOBA]." 42 U.S.C. § 3796c(a). 28 C.F.R. § 32.2(c)(1), however, improperly narrowed the effect of Congress' definition of "law enforcement officers," so that only the families of law enforcement officers who died in "controlling or reducing crime" or "enforcing the criminal law" would be deemed to have died in the "line of duty" and eligible for PSOBA survivor benefits. The express intent of Congress was for the families of all law enforcement officers involved in *"enforcement of the laws,"* whether criminal or civil, to be eligible for PSOBA survivor benefits, if they died enforcing those laws. Since the BJA's Final Decision applied 28 C.F.R. § 32.2(c)(1) to undermine Congress' di-

rection, it is contrary to law, as well as arbitrary and capricious, and is entitled to no deference. *See Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 485, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (holding that judicial deference is not warranted where an agency "construe[d] the statute in a way that completely nullifies textually applicable provisions meant to limit [the agency's] discretion."); *see also* 28 C.F.R. § 32.4 ("[The BJA] shall resolve any reasonable doubt arising from the circumstances of the officer's death ... in favor of payment of the death ... benefit.").[5]

▮ The court has determined, as a matter of fact and law, that Ms. Hawkins was a law enforcement officer who "died as the direct and proximate result of a personal injury sustained in the line of duty." 42 U.S.C. § 3796(a).

### CONCLUSION

For the reasons discussed herein, the Government's Motion for Judgment on the Administrative Record is denied. The Clerk of the Court is ordered to enter a Final Judgment, in accordance with this Memorandum Opinion and Final Order, for Plaintiffs in the amount of $50,000.00.

**IT IS SO ORDERED.**

---

5. Since the court has determined that Ms. Hawkins was a "public safety officer" and the BJA's Final Decision was arbitrary and capricious, the court does not need to address the issue of "substantial evidence."