# United States Court of Appeals for the Federal Circuit

06-5035

LEONARD E. CASSELLA,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Gordon C. Lane, Lane & Young, of Charleston, West Virginia, argued for plaintiff-appellee.

Dawn S. Conrad, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Donald E. Kinner, Assistant Director. Of counsel on the brief was Jason P. Cooley, Attorney Advisor, Office of General Counsel, Office of Justice Programs, United States Department of Justice, of Washingtion, DC.

Appealed from: United States Court of Federal Claims

Senior Judge Bohdan A. Futey

# United States Court of Appeals for the Federal Circuit

06-5035

LEONARD E. CASSELLA,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED:  December 1, 2006

_____

Before MICHEL, <u>Chief Judge</u>, LOURIE, <u>Circuit Judge</u>, and ELLIS,* <u>District Judge</u>.

MICHEL, <u>Chief Judge</u>.

The claim at issue in this case was brought under the Public Safety Officers' Benefits Act ("PSOBA" or "Act") of 1976, Pub. L. No. 94-430 (codified as amended at 42 U.S.C. §§ 3796-96c (2000)).  The United States appeals an October 19, 2005 order of the United States Court of Federal Claims holding that Mrs. Mildred W. Cassella, a part-time Special School Zone Police Officer ("SSZPO") employed by the City of Weirton (WV) Police Department ("WPD"), was a "public safety officer" who died as a direct and proximate result of a personal injury sustained in the "line of duty," and therefore met the Act's requirements for an award of a death benefit to her survivor, plaintiff.  <u>Cassella</u>

---

\* Honorable T.S. Ellis, III, United States District Court for the Eastern District of Virginia, sitting by designation.

v. United States, 68 Fed. Cl. 189 (Fed. Cl. 2005). In the opinion accompanying the order, the Court of Federal Claims invalidated 28 C.F.R. § 32.2(m), a portion of the regulation in which the Bureau of Justice Assistance ("BJA"), a unit of the Department of Justice charged with implementing the Act, further defined terms of the Act, particularly "law enforcement officer," a species of the statutory term "public safety officer." We reverse the court's judgment of entitlement and vacate the court's invalidation of 28 C.F.R. § 32.2(m).

## I. BACKGROUND

### A.

The PSOBA provides a one-time cash payment to survivors of public safety officers who die in the line of duty. In relevant part, § 3796(a) provides that "[i]n any case in which the Bureau of Justice Assistance determines . . . that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit . . . ." 42 U.S.C. § 3796(a). For a survivor or survivors to be entitled to payment, the public safety officer must have suffered a personal injury within the meaning of the Act, the injury must have been suffered in the line of duty, and the death must have been the direct and proximate result of the personal injury. Id.; see also Yanco v. United States, 258 F.3d 1356, 1359 (Fed. Cir. 2001).

A "public safety officer" was statutorily defined in the 2000 version of the Act, applicable here, as "an individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer, as a firefighter, or as a member of a rescue squad or ambulance crew[.]" 42 U.S.C. § 3796b(7)(A). A "law enforcement

06-5035                                    2

officer," in turn, was defined as "an individual involved in crime and juvenile delinquency control or reduction, or <u>enforcement of the laws</u>, including, but not limited to, police, corrections, probation, parole, and judicial officers[.]" 42 U.S.C. § 3796b(5) (emphasis added). The Act, however, does not define "line of duty."

The BJA is authorized under § 3796c(a) to "establish such rules, regulations, and procedures as may be necessary to carry out the purposes of" the PSOBA. 42 U.S.C. § 3796c(a). Pursuant to this authority, the BJA promulgated the regulations set forth in Part 32 of Title 28 of the Code of Federal Regulations (28 C.F.R. §§ 32.1 et. seq.). Section 32.2(c)(1) defined "line of duty" as:

> Any action which an officer whose primary function is crime control or reduction, enforcement of the criminal law, or suppression of fires is obligated or authorized by rule, regulation, condition of employment or service, or law to perform, including those social, ceremonial, or athletic functions to which the officer is assigned, or for which he is compensated, by the public agency he serves. <u>For other officers</u>, "line of duty" means any action the officer is so obligated or authorized to perform in the course of <u>controlling or reducing crime</u>, enforcing the criminal law, or suppressing fires . . . .

28 C.F.R. § 32.2(c)(1) (emphases added). In § 32.2(m), the statutory definition of "law enforcement officer" was clarified to mean an "individual involved in crime and juvenile delinquency control or reduction, or <u>enforcement of the criminal law</u> . . . ." 28 C.F.R. § 32.2(m) (emphasis added).

**B.**

Plaintiff is the surviving husband of the late Mrs. Mildred W. Cassella. Mrs. Cassella was employed by the WPD for seven years as a part-time SSZPO. Mrs. Cassella held her position as a SSZPO pursuant to West Virginia Statute § 8-14-5, which provides:

> Every municipality shall have plenary power and authority to provide by ordinance for the appointment of special school zone police officers, who shall have the duty of controlling and directing traffic upon designated parts of the streets, avenues, roads, alleys or ways at or near schools, and who, <u>in the performance of such duty, shall be vested with all the powers of local police officers</u>. Such special school zone police officers shall be in uniform, shall display a badge or other sign of authority, shall serve at the will and pleasure of the appointing authority, and shall not come within the civil service provisions of this article or the policemen's pension and relief fund provisions . . . .

W. Va. Code § 8-14-5 (emphasis added).

At approximately 2:25 p.m. on April 12, 2002, Mrs. Cassella was on duty at the intersection of West Virginia 105 (Pennsylvania Avenue) and California Avenue in Weirton. Mrs. Cassella entered the eastbound lane of Pennsylvania Avenue from California Avenue to stop traffic so that a school bus could pull away from the curb. She was wearing her police-issued orange vest and carrying a whistle and stop sign. While standing in the eastbound traffic lane, Mrs. Cassella was fatally struck from the side by a sport utility vehicle traveling eastward. Mrs. Cassella was taken by ambulance to a local hospital where she was pronounced dead by reason of blunt force traumatic injury at 2:50 p.m. The individual who was driving the vehicle that struck and killed Mrs. Cassella was charged and convicted of two traffic violations.

### C.

Following Mrs. Cassella's death, plaintiff filed a PSOBA death benefit claim with the BJA on July 30, 2002. The BJA reviewed the claim and issued a decision in May 2003 that plaintiff was not entitled to receive the death benefit authorized to be paid under the Act. The BJA concluded that Mrs. Cassella was not a "public safety officer" within the meaning of the Act, because as a SSZPO, Mrs. Cassella did not meet the definition of "law enforcement officer," the only type of "public safety officer" applicable

here, because she did not have the duty to control or reduce crime and juvenile delinquency or to enforce criminal law.

Plaintiff appealed the decision within the Department of Justice, and in accordance with BJA regulations, an appeal hearing was held on February 26, 2004 before an independent Hearing Officer. Mr. Michael D. Gordon, Weirton's Chief of Police at the time of Mrs. Cassella's death, provided detailed testimony as to Mrs. Cassella's duties and responsibilities as a SSZPO for the WPD.

Chief Gordon testified at the hearing that Mrs. Cassella was responsible for directing and controlling traffic at a particular street intersection in Weirton during the times of the day when school buses and children were entering and leaving school. Chief Gordon testified that Mrs. Cassella also had "an implied responsibility" to be watchful for the welfare of children at her crossing and could intervene and report to the police any problems such as suspected child abuse and bullying between children.

Chief Gordon further testified that Mrs. Cassella was neither a "sworn" officer nor a state-certified law enforcement officer and that she did not attend a police academy or undergo any formal police training. Rather, Chief Gordon stated, Mrs. Cassella was trained for her position as a SSZPO by going through an "informal on-the-job break-in-period" with another SSZPO. As a SSZPO, Mrs. Cassella was outfitted with an orange vest, whistle, and stop sign, but did not carry a communications device or a firearm or other type of weapon.

Chief Gordon testified that Mrs. Cassella was the "face of the police" and a "figure of authority" during the specific time that she was instructed to be on duty, but, unlike other officers who had attended the police academy, she did not have the power

to make an arrest or stop a crime in progress. Rather, Chief Gordon asserted, Mrs. Cassella had "indirect arrest power" in that "she could gather information regarding an offense" and then report it to "other police officers within the department [who] would proceed against the violators." Although Chief Gordon testified that Mrs. Cassella was a "law enforcement officer in that she was responsible for the enforcement of traffic laws," she would actually report any traffic violations she observed to regular officers of the WPD. Further, when asked if she was vested with all the powers of local police, Chief Gordon stated, "For her job description as a special school zone officer, yes."

The Hearing Officer issued a Determination on April 12, 2004, affirming the BJA's prior denial of benefits. The Hearing Officer first concluded that Mrs. Cassella was not a "law enforcement officer" because she did not possess the requisite law enforcement authority, nor was her primary function that of crime control or reduction. The Hearing Officer noted that, under West Virginia law, a "law enforcement officer" is defined as a "duly authorized member of a law-enforcement agency who is authorized to maintain public peace and order, prevent and detect crime, make arrests and enforce the laws of the state or any county or municipality thereof," W. Va. Code § 30-29-1, and that, with a few exceptions not relevant here, "no person may be employed as a law-enforcement officer . . . unless the person is certified." W. Va. Code § 30-29-5. The Hearing Officer concluded that Mrs. Cassella's position did not meet this definition, since she was neither certified by the state nor authorized to make arrests.

The Hearing Officer also found that Mrs. Cassella did not die in the "line of duty" as defined in the PSOBA because for "a public safety officer whose primary function is not crime control . . . death in the 'line of duty' must have resulted from activities directly

related to reducing crime or enforcing the criminal law." The Hearing Officer concluded that Mrs. Cassella was directing traffic at the time of her death, rather than reducing crime or enforcing the criminal law, and therefore did not die in the "line of duty."

On October 6, 2004, plaintiff filed a complaint with the United States Court of Federal Claims seeking review of the Hearing Officer's determination. The court stayed proceedings so that plaintiff could first submit his claim to the BJA Director for a final agency determination. Plaintiff appealed the Hearing Officer's determination to the BJA Director pursuant to 28 C.F.R. § 32.24 on February 18, 2005. On April 28, 2005, the BJA Director issued the agency's final determination upholding the determinations of the Hearing Officer. The Director agreed with the BJA and the Hearing Officer that Mrs. Cassella was not a "public safety officer" because she "lacked requisite legal and actual authority as a law enforcement officer to control or reduce crime or enforce the criminal law." The Director also determined that even if Mrs. Cassella actually had law-enforcement authority and duties, she did not sustain a fatal injury in the "line of duty" as required by the PSOBA. In this regard, the Director stated that plaintiff failed to show that Mrs. Cassella was in fact enforcing criminal laws at the time of her death, such as pulling over and detaining a drunk driver. The evidence showed that Mrs. Cassella was simply controlling traffic in an intersection at the time of her death.

The Court of Federal Claims reinstated its proceedings on May 17, 2005. The United States filed a motion for judgment on the administrative record on June 23, 2005, and plaintiff filed a cross-motion for judgment on the administrative record on July 28, 2005. The court issued a decision on October 19, 2005 denying the United States' motion for judgment, granting plaintiff's cross-motion for judgment, and entering a final

judgment in favor of plaintiff in the statutory amount of $250,000.00. <u>Cassella</u>, 68 Fed. Cl. at 195.

Both plaintiff and the government briefed arguments before the trial court with regard to whether Mrs. Cassella's duties involved the enforcement of criminal law. The trial judge, however, relying heavily on an earlier decision by another judge of the Court of Federal Claims in <u>Hawkins v. United States</u>, 68 Fed. Cl. 74 (Ct. Cl. 2005), concluded that these arguments were ultimately irrelevant. Rather, following the earlier decision that a "law enforcement officer" encompasses an individual who solely enforces civil law, the court determined that the issue on appeal was whether Mrs. Cassella's responsibilities as a SSZPO included enforcement of the laws, criminal or otherwise. <u>Cassella</u>, 68 Fed. Cl. at 194. The court proceeded to find that Mrs. Cassella's responsibilities included enforcement of "non-criminal" laws, i.e., traffic laws and the welfare of children in her crossing zone. <u>Id.</u> Thus, the court concluded that Mrs. Cassella was a "law enforcement officer" for purposes of the PSOBA. <u>Id.</u>

The Court of Federal Claims further invalidated 28 C.F.R. § 32.2(m), the regulation in which the BJA defined a "law enforcement officer" as an "individual involved in crime and juvenile delinquency control or reduction, or enforcement of the criminal law," as an "invalid restriction of the statute," 42 U.S.C. § 3796b(5). <u>Id.</u> at 193. The court stated that § 3796b(5) does not limit a "law enforcement officer" to those who enforce the <u>criminal law</u>, but rather encompasses an individual involved in "enforcement of the <u>laws</u>," whether criminal or otherwise. <u>Cassella</u>, 68 Fed. Cl. at 193-94.

Finally, the trial court held that Mrs. Cassella died in the "line of duty" as defined by the PSOBA. <u>Id.</u> at 195. The court found that since Mrs. Cassella was enforcing the

traffic laws at the time of her death, she was killed in the "line of duty." Id. For these reasons, the court held that plaintiff was entitled to the death benefit under the Act. Id.

This appeal followed. This court has subject matter jurisdiction under 28 U.S.C. § 1295(a)(3) because the appeal is from a final judgment of the Court of Federal Claims.

## II. DISCUSSION

### A.

In reviewing an administrative denial of a benefit under the PSOBA, the Court of Federal Claims is limited to deciding: (1) whether there has been substantial compliance with statutory requirements and provisions of implementing regulations; (2) whether there has been any arbitrary or capricious action by the government officials involved; and (3) whether substantial evidence supports the agency's decision. Chacon v. United States, 48 F.3d 508, 511 (Fed. Cir. 1995). On appeal, we review the judgment of the Court of Federal Claims de novo, applying the same deferential standards anew. Greeley v. United States, 50 F.3d 1009, 1010-11 (Fed. Cir. 1995) (in PSOBA case, finding that BJA's factual finding that traumatic injury was not a substantial factor in fire chief's death was supported by substantial evidence, and reversing Court of Federal Claims' judgment to the contrary).

### B.

The government argues on appeal that the BJA's regulatory interpretation of the term "law enforcement officer" is entitled to deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). According to the government, the Court of Federal Claims erred in concluding that "law enforcement

officer" in § 3796b(5) constitutes the "unambiguously expressed intent of Congress" to cover not only individuals who enforce criminal law, but also individuals who enforce only civil law. The government asserts that the cited statutory phrase "enforcement of the laws" in § 3796b(5) is actually ambiguous, since the term "laws" may encompass many different types of law or only criminal law. Given this ambiguity, the government asserts that the BJA's interpretation of the PSOBA as requiring that "law enforcement officer[s]" be involved in the enforcement of criminal rather than purely civil law warrants Chevron deference because it is consistent with the intent of Congress to benefit the families of those involved in crime control and reduction. The government asserts that Congress's intent is demonstrated here in the plain meaning of the phrase's contextual language, the Act's legislative history, and clarification in a recent statutory amendment. In contrast, plaintiff argues that the Court of Federal Claims correctly determined that the death benefit under the PSOBA is available to survivors of "law enforcement officers" who enforce criminal and/or civil laws.

This court recently resolved this very issue on appeal in Hawkins v. United States, No. 06-5013 (Fed. Cir. Nov. 17, 2006). In Hawkins, we confronted the question of whether a "law enforcement officer" involved in "enforcement of the laws" as defined in the PSOBA includes officers who are involved in only civil law enforcement or is limited to officers who are involved in criminal law enforcement. Slip op. at 10. Taking into consideration the literal text of the statute defining "law enforcement officer" and the Act's legislative history, we concluded that Congress intended "law enforcement officer" to cover individuals who enforce criminal law rather than merely civil law. Id. at 11. Since we found the definition of "law enforcement officer" unambiguous after employing

these traditional tools of statutory construction, we declined to reach the government's argument that deference to its regulatory interpretation of "law enforcement officer" was due under Chevron. Id. at 14.

Nevertheless, we observed that to the extent the phrase "enforcement of the laws" could be viewed as ambiguous as to the type of "laws" Congress intended to encompass in the statute, the BJA's interpretation thereof to exclude an officer who only enforces civil law was reasonable. Id. As noted above, "law enforcement officer" was defined by statute in 42 U.S.C. § 3796b(5) as "an individual involved in . . . enforcement of the laws[,]" 42 U.S.C. § 3796b(5) (emphasis added), but defined by regulation in 28 C.F.R. § 32.2(m) as an "individual involved in . . . enforcement of the criminal law." 28 C.F.R. § 32.2(m) (emphasis added). Thus, the BJA, by regulation, excluded individuals who only enforce the civil law from the definition of "law enforcement officer" such that survivors of these individuals would not qualify for a death benefit under the Act. Given that the definition of "law enforcement officer" unambiguously refers to individuals who are involved in criminal law enforcement rather than only civil law enforcement, however, we find that the BJA's definition of "law enforcement officer" as set forth in 28 C.F.R. § 32.2(m) is consistent with, and gives proper effect to, the intent of Congress to protect the families of those officers involved in criminal law enforcement. As such, the BJA regulation interpreting "law enforcement officer," 28 C.F.R. § 32.2(m), contrary to the holding of the trial court, is not "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 844. We therefore vacate its invalidation by the Court of Federal Claims.

The BJA has consistently ruled that an individual is a "law enforcement officer" if he or she is an officer of a public agency, and in that capacity, has authority and responsibility to fight crime or enforce the criminal law. Common hallmarks considered by the BJA include an individual's power to arrest, apprehend, prosecute, adjudicate, correct, detain (in a prison or other detention or confinement facility), or supervise (as a parole or probation officer) persons who are alleged or found to have violated the criminal law. In this regard, the BJA has extended coverage under the PSOBA to auxiliary police, conservation officers who enforce criminal law, constables with arrest power, security officers in a psychiatric hospital for the criminally insane, and an animal control officer with peace-officer power and responsibility. See Legal Interpretations of the Public Safety Officers' Benefits Act, Office of General Counsel, Dep't of Justice, November 1981 (cited in Chacon v. United States, 48 F.3d 508, 512 (Fed. Cir. 1995)). We conclude that the BJA's interpretation of "law enforcement officer" to limit applicability of the PSOBA to individuals who have the authority and responsibility to fight crime or enforce the criminal law is "reasonable," and therefore is entitled to deference. Chevron, 467 U.S. at 845.

Turning to the facts of this case, we find that the BJA's determination that Mrs. Cassella was not a "law enforcement officer" under 42 U.S.C. § 3796b(5) is supported by substantial evidence. Plaintiff argues that even if this court overrules the standard articulated by the Court of Federal Claims in Hawkins v. United States, 68 Fed. Cl. at 83, substantial evidence in the record supports a finding that Mrs. Cassella was in fact involved in the control or reduction of crime and juvenile delinquency as well as criminal law enforcement and therefore, meets the definition of "law enforcement officer." In

support of this argument, Plaintiff points to W. Va. Code § 8-14-5 as evidence that SSZPOs have full police power. Plaintiff asserts that, as a full police officer, Mrs. Cassella had the authority and duty to control, reduce, and enforce many non-traffic criminal laws, such as juvenile delinquency and child abuse, as well as make arrests. Plaintiff also cites to numerous other West Virginia statutes that indicate that many traffic violations are punishable by jail time.

In Hawkins, we held that the PSOBA was enacted to provide benefits to the families of individuals who were "exposed to the 'constant risk of death' by acts of criminals or related events inherent in the activities of crime and juvenile delinquency control or reduction, or enforcement of the criminal law." Slip op. at 15-16. Thus, to be a law enforcement officer, "the officer must be actually appointed for and authorized or obligated to fight crime or perform criminal law enforcement duties on behalf of the police agency that he or she serves." Id. at 16 (emphases added). Here, no lower court or agency decision actually held that Mrs. Cassella was appointed for, trained for, authorized, assigned, or obligated to fight crime or perform criminal law enforcement duties. Indeed, the district court found that Mrs. Cassella's responsibilities included "enforcing non-criminal laws, namely traffic laws." Cassella, 68 Fed. Cl. at 194. We conclude therefore that substantial evidence supports the BJA's decision that Mrs. Cassella was not involved in the enforcement of criminal law and as such, was not a "law enforcement officer" under the Act.

While Mrs. Cassella held her position as SSZPO under W. Va. Code § 8-14-5, we agree with the BJA that this statute invests SSZPOs with "all the powers of local police officers" only in connection with their duty of controlling and directing traffic. This

finding is supported by the testimony of Chief Gordon, who when questioned if Mrs. Cassella was vested with all the powers of local police, stated, "For her job description as a special school zone officer, yes." Indeed, to hold otherwise would be directly contradictory to other West Virginia statutes which clearly evidence that an individual must be trained and certified in order to be considered a "law enforcement officer." See W. Va. Code § 30-29-1 (defining "law enforcement officer" as a "duly authorized member of a law-enforcement agency who is authorized to maintain public peace and order, prevent and detect crime, make arrests and enforce the laws of the state or any county or municipality thereof"); W. Va. Code § 30-29-5 ("[N]o person may be employed as a law-enforcement officer by any West Virginia law enforcement agency . . . unless the person is certified . . . by the governor's committee as having met the minimum entry level law enforcement qualification and training program requirements."). Thus, we find that, contrary to plaintiff's assertions, Mrs. Cassella did not have the authority and obligation to control or reduce crime and juvenile delinquency or enforce criminal law under the West Virginia statutes.

Consequently, the fact that many traffic violations are criminal offenses under West Virginia law is not dispositive in this case. As Chief Gordon testified, Mrs. Cassella did not have the power to arrest the violator of a traffic crime or to stop a traffic crime in progress. Rather, Mrs. Cassella would have to actually report any traffic violations she observed to the police who would then proceed against the violators. As we held in Hawkins, "an officer's actual responsibilities or obligations as appointed, rather than some theoretical authorizations, are controlling under the PSOBA." Slip op. at 16. Here, Chief Gordon's uncontroverted testimony confirms that Mrs. Cassella did

not actually have the authority or responsibility to stop traffic crimes in progress (such as pull over and apprehend a drunk driver).

We further are not persuaded by plaintiff's assertions that Mrs. Cassella was involved in the control or reduction of juvenile delinquency. As testified to by Chief Gordon, Mrs. Cassella merely had "an implied responsibility" to be watchful for the welfare of children at her crossing. Such an implied responsibility does not equate to the responsibilities and obligations of trained and certified juvenile delinquency police officers.[2]

Plaintiff also asserts that the legislative history of the PSOBA, wherein Senator Moss testified that a police officer killed while directing traffic should be covered by the Act, see 122 Cong. Rec. 22644 (1976), confirms that Mrs. Cassella was a "law enforcement officer" under the Act. We disagree. The debate to which plaintiff refers actually centers around the application of "line of duty," rather than the definition of "law enforcement officer." The Senate bill that was favorably reported by the Judiciary Committee provided a death benefit to survivors only if an officer died in the line of duty from "injuries directly and proximately caused by a criminal act or an apparent criminal act." S. Rep. No. 94-816, at 1 (1976), reprinted in 1976 U.S.C.C.A.N. 2504 (emphases added). However, an amendment was introduced on the Senate floor substituting "as the direct and proximate result of a personal injury sustained in the line of duty" for the

---

[2]     The BJA has interpreted juvenile delinquency laws to be a species of criminal law and included within the definition of criminal law. We see no reason to disturb this interpretation. Cf. Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1164(a)(4), 119 Stat. 2960 (Jan. 5, 2006) (amending 42 U.S.C. § 3796b(6) by replacing the phrase "enforcement of the laws" with "enforcement of the criminal laws (including juvenile delinquency)").

more limiting "criminal act" language.  Speaking in support of the amendment, Senator Moss stated,

> [B]y requiring that the benefit be limited to death resulting from an injury directly or proximately caused by a criminal act, the committee has failed to provide for the stated purpose and need of this legislation.  This specific language leaves a loophole in the bill whereby those who should be benefited and are deserving may be excluded.  There can arise a situation which may give cause to question whether a death was actually the result of a criminal act.  An excellent example is the police officer who is directing traffic.

122 Cong. Rec. 22644 (1976) (statement of Sen. Moss).  Thus, the purpose of the amendment was to enlarge the set of scenarios in which death of a law enforcement officer would be covered by the PSOBA but not enlarge the definition of "law enforcement officer" per se.  The BJA has given effect to Congress's intent here by including within the "line of duty" any social, ceremonial, or athletic functions to which a criminal law enforcement officer is assigned or for which he or she is compensated.  See 28 C.F.R. § 32.2(c)(1).  This regulation simply cannot apply to Mrs. Cassella because she was not a criminal law enforcement officer in the first place.

Finally, plaintiff avers that it is incomprehensible that the BJA would consider a FEMA worker, a chaplain, an auxiliary police officer, and a conservation officer eligible for benefits under the PSOBA, while excluding a SSZPO who risked her life daily to protect the public.  In the 2000 version of the Act, applicable here, Congress chose to statutorily protect only certain types of "public safety officer[s]," including law enforcement officers, firefighters, rescue squad members, ambulance crew members, certain FEMA employees, and certain State, local or tribal employees performing official

06-5035                                    16

duties in cooperation with FEMA. 42 U.S.C. § 3796b(7).[3] The only species of "public safety officer" of relevance here is "law enforcement officer," which as explained above, is limited to an individual involved in crime and juvenile delinquency control or reduction, or enforcement of the criminal law. Plaintiff does not contend, and no evidence of record suggests, that Mrs. Cassella meets the definition of any of the other species of "public safety officer." As Mrs. Cassella was not involved in crime and juvenile delinquency control or reduction, or enforcement of the criminal law, she simply does not meet the definition of "law enforcement officer" as required under the PSOBA. The proper forum to address the omission of individuals such as Mrs. Cassella from the PSOBA is before Congress, not a court charged with interpreting the Act. See Boyer v. West, 210 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court can only interpret the statutes that are enacted by the Congress. Any changes that parties may seek in order to eliminate a statutory incongruity should be brought to the attention of Congress. We are simply powerless to amend any statutory provision sua sponte.").

Since a "law enforcement officer" must be appointed for and given the authorization or obligation to perform duties involving crime and juvenile delinquency control or reduction or the enforcement of criminal law and Mrs. Cassella was not, the BJA's determination that Mrs. Cassella was not a "law enforcement officer" under 42 U.S.C. § 3796b(5) (2000) is supported by substantial evidence and legally correct.

---

[3] The definition of "public safety officer" was expanded in 2003 to include "an individual serving a public agency . . . as a chaplain." 42 U.S.C. § 3796b(8) (Supp. III 2003).

**C.**

Contrary to the ruling of the trial court, Mrs. Cassella could not be a law enforcement officer who died in the "line of duty" because she was simply not a "law enforcement officer" as defined in the PSOBA. Therefore, we need not and do not review whether she otherwise met the definition of "line of duty" at her death, i.e., whether she was performing actions that she was "obligated or authorized to perform in the course of controlling or reducing crime, [or] enforcing of the criminal law" at the scene of her death. 28 C.F.R. § 32.2(c)(1).

**III. CONCLUSION**

For the foregoing reasons, the order of the Court of Federal Claims denying the government's motion for judgment on the administrative record, and entering a final judgment for plaintiff is

REVERSED-IN-PART and VACATED-IN-PART.